FILED
2026 Sep-22 PM 01:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| LEE WILLIAMSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-00139-SGC |
| | ) | |
| HERITAGE PRESCHOOLS, LLC, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this action filed under 42 U.S.C. § 1981, Plaintiffs Lee and Aletta Williamson claim defendants Heritage Preschools, LLC, and Heritage Preschools of Homewood, LLC (collectively, "Heritage" or "the defendants"), discriminated and retaliated against them and their toddler son, J.W., based on race. (Doc. 1).[1] Before the court is the Williamsons' motion to sanction Heritage for its alleged spoliation of evidence. (Doc. 57). The motion is ripe and ready for review. (Docs. 60, 62). For the reasons set forth below, the court finds Heritage failed to take reasonable steps to preserve video footage that cannot be restored or replaced, causing prejudice to the Williamsons. Therefore, the court will grant in part the plaintiffs' motion and

[1] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

order curative measures to address the harm the Williamsons suffered because of Heritage's spoliation.

## I. Background

The Williamsons enrolled J.W., who is African American, as a student at Heritage when he was a few months old. (Doc. 57-3 at 7). They allege that during J.W.'s first two years at Heritage, they received no disciplinary reports about him. (Doc. 57-15 at 2). In May 2023, Heritage promoted J.W. to the Toddler B classroom, which was taught by Caroline Harmon, who is white. (Doc. 1 at 11). For most of his time in Harmon's class, J.W. was the only African American child. (Doc. 57-10 at 4). Soon after starting in Harmon's class, J.W. received numerous disciplinary reports for what the Williamsons contend is normal toddler behavior. (Doc. 57-3 at 42). An assistant teacher told the Williamsons white students in Harmon's class engaged in the same behavior as J.W. but were not disciplined. (Doc. 57-5 at 18).

Heritage had a video surveillance system that recorded student conduct in the classroom. (Doc. 57-25 at 21). In July 2023, the system retained video footage for two weeks before it recorded new footage over the old. (*Id.* at 14). According to Heritage, video footage could be preserved if Heritage administrators downloaded the video clip before it was overwritten. (Doc. 60 at 2). In July 2023, video clips were only downloaded if they captured onsite injuries or other extraordinary events. (*Id.*). Heritage did not preserve video footage of "ordinary happenings in a

classroom, such as the video which is the subject of [the Williamsons'] motion." (*Id.*).

On June 15, 2023, the Williamsons met with Heritage employees Alexis Neal (director), Ellie Hansen (assistant director), and Laurie Forester (assistant director) to discuss their concerns about Harmon's discipline of J.W. (Doc. 57-5 at 24, 26). The Williamsons were informed that J.W. would be placed on a four week "behavior probationary period" to track whether his behavior improved. (*Id.* at 27). During the meeting, the Williamsons asked to review the video depicting J.W.'s behavior. (Doc. 57-9 at 32-33). Heritage told them they could not review video footage of behavior incidents. (*Id.* at 33). At the time, Heritage did not have a policy broadly prohibiting parents from viewing classroom video, and it allowed parents to review footage of accidents and incidents not involving another child. (*Id.*; Doc. 57-39 at 28).

On July 19, 2023, Aletta notified Heritage that J.W. was diagnosed as being on the autism disorder spectrum. (Doc. 57-8 at 14). In response, Hansen stated, "We will add it to his record. As we are approaching his third week of being on the behavior plan, we would love to meet with you and Lee to discuss next steps." (*Id.*).

On July 28, 2023, the Williamsons again met with Hansen (who was acting director while Neal was on maternity leave) and Forester. (*Id.* at 14-15). Hansen advised them J.W.'s behavior had not improved, Heritage would no longer provide services for him, and his last day would be two weeks later. (Doc. 57-45 at 2). The

Williamsons protested the decision and advised Heritage they would seek legal counsel and contact the Office of Civil Rights, part of the United States Department of Education with authority to investigate complaints of discrimination based on protected status. (*Id.*; Doc. 57-5 at 29).

Hansen interpreted the Williamsons' comments as a threat of legal action. (Doc. 57-22 at 4). After the meeting concluded, she contacted Clint Maze, Heritage's counsel, to let him know she would give his contact information to the Williamsons. (Doc. 57-34 at 2). Hansen and Forester also emailed Larry Van, Heritage's CEO, on the afternoon of July 28 to advise him the Williamsons had accused Heritage of discrimination and were seeking counsel about the possibility of a discrimination lawsuit. (Doc. 57-45). At 4:47 that afternoon, Hansen sent the following email to the Williamsons with a copy to Maze:

> Mr. and Mrs. Williamson,
>
> Because of the threat of legal action this afternoon during our meeting, we are disenrolling your family from Heritage Preschool of Homewood effective immediately. . . . Any further communication will need to be addressed to our attorney, Clint Maze, with Wilmer & Lee, Associates. . . .

(Doc. 57-34 at 2).

The Williamsons did not send a preservation letter to Heritage requesting video footage be maintained for use during litigation. (Doc. 60 at 2). Heritage took no steps to preserve the video footage of J.W.'s classroom following the July 28

meeting and what it interpreted as the Williamsons' legal threat. (Doc. 57-22 at 7). Hansen acknowledged video footage of J.W.'s last two weeks at Heritage would be important evidence and would shed light on whether there was a valid basis to expel J.W. (*Id.* at 10). Nevertheless, it did not occur to her to capture video evidence of J.W.'s behavior. (*Id.* at 9).

The Williamsons filed this action in February 2024, claiming the defendants discriminated against J.W. by disciplining and ultimately expelling him for conduct white students engaged in without consequence. (Doc. 1). Heritage contends the plaintiffs' subsequent media appearance was the first time they mentioned race as the reason Heritage expelled J.W.; before that, the Williamsons had raised only J.W.'s autism and Heritage's failure to accommodate him. (Doc. 60 at 2). During discovery, when the Williamsons requested that Heritage produce video evidence, Heritage represented it had no such material. (Doc. 57-44 at 2). Nevertheless, Heritage's witnesses repeatedly referred to the video footage as justification for expelling J.W. For example, Hansen testified she decided to expel J.W. based on her contemporaneous review of the video footage from July 15-28, 2023—J.W.'s last two weeks at Heritage—while acknowledging her written summaries of J.W.'s conduct during the same time did not indicate he would be expelled. (Doc. 57-21 at 33; Doc. 57-22 at 33-35). Heritage Director Alexis Neal testified that during the time in question, she and other Heritage administrators generally reviewed video footage

to corroborate disciplinary reports. (Doc. 57-25 at 14). Further, in its motion for summary judgment, Heritage relies on its administrator's review of the video as evidence it did not expel J.W. based on race. (Doc. 48-1 at 12, 24). In addition, Harmon testified that, in her opinion, J.W.'s conduct during his last two weeks was not worthy of expulsion. (Doc. 57-17 at 46).

**II. Analysis**

Spoliation is the destruction of evidence or the significant and meaningful alteration of a document, and a party's spoliation of evidence may warrant sanctions. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020). A district court may impose spoliation sanctions under its broad discretion and inherent power to "manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023) (internal citations and quotations omitted). Other sources, such as Federal Rule of Civil Procedure 37, also grant a district court authority to impose sanctions for spoliation of evidence. *See id.* Rule 37 provides as follows:

> (e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C) dismiss the action or enter a default judgment.

Rule 37 "seeks to balance the centrality of electronic information to modern litigation with the almost always substantial (and sometimes unnecessary) costs of preserving electronic data." *Skanska*, 75 F.4th at 1311. Rule 37 is a "two-tiered sanctions regime" that permits lesser sanctions for spoliation that prejudices another party and greater sanctions only upon a finding that the spoliating party acted in bad faith—generally meaning the party destroyed or failed to preserve adverse evidence for the purpose of hiding it.[2] *See id.* at 1311-12. In either case, the court must find (1) a party failed to take reasonable steps to preserve electronically stored information ("ESI") in the anticipation or conduct of litigation and (2) the ESI cannot be restored or replaced through other discovery. Fed. R. Civ. P. 37(a).

The imposition of lesser sanctions focuses only on the effect on the other party. *Skanska*, 75 F.4th at 1311. Sanctions under this tier must be no greater than necessary to cure the prejudice. To impose the harsher sanctions of a presumption

---

[2] A finding of malice, however, is not required under the bad faith standard. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1311 (11th Cir. 2009).

of unfavorability, a jury instruction, or dismissal/default judgment, the court focuses solely on whether the offending party acted with the intent to deprive the other of the evidence; a finding of prejudice is not required. *Id.* A party's negligence or gross negligence does not satisfy this standard. *Id.*

In *Skanska*, the Eleventh Circuit considered a district court's imposition of spoliation sanctions for Skanska's destruction of cellphone text messages of five of its employees. 75 F.4th 1290. Skanska owned barges whose moorings snapped and caused significant damage when Hurricane Sally hit Pensacola Bay in 2020. Skanska's in-house counsel orally informed employees of its evidence retention policy within days of the hurricane and sent a formal legal hold letter about a month later. *Id.* at 1312. Litigation started shortly thereafter, but Skanska did not back up its employee's cell phones or suspend its ordinary cell phone data destruction policies, even for known ESI custodians. *Id.* The district court found Skanska's "lack of any cogent explanation for these failures, other than 'oops,' point[ed] to one answer – Skanska acted in bad faith," and it sanctioned Skanska by imposing two adverse inferences and awarding fees and costs incurred by the claimants in connection with the spoliation motion. *In re Skanska USA Civil Southeast Inc.*, 340 F.R.D. 180, 189, 191 (N.D. Fla. 2021).

On appeal, Skanska argued these failures should be excused because (1) it may not have reasonably anticipated litigation, (2) discovery of other Skanska

employees included some of the text messages, and (3) the five custodians at issue were deposed. 75 F.4th at 1312. The Eleventh Circuit rejected these arguments, finding it was "entirely predictable that cell phone data would be needed for litigation, and that some of that data would be lost." *Id.* at 1313. Further, not all the text messages were recovered, "[a]nd it should go without saying that deposing workers well after an event is not a perfect substitute for reviewing their contemporaneous text messages." *Id.*

Skanska also challenged the district court's finding that it acted in bad faith by failing to back up the text messages and suspend its destruction policies. The Eleventh Circuit stated:

> If our review were de novo, this would be a close question. On the one hand, we find Skanska's utter failure to implement even the most basic data-protection safeguards egregious—so egregious that an inference of bad faith is easy to make. On the other, this is not a case with direct evidence of bad faith; it is also plausible from this record that Skanska was "just" grossly negligent.
>
> But we review the district court's finding of bad faith for clear error. And an inference of bad faith here was not clear error. Skanska can provide no reasonable explanation for its conduct other than to plead negligence. True enough, much of the evidence was destroyed through "routine" document destruction policies. But a hands-off implementation of an ordinary corporate destruction policy is not a silver bullet. We have already explained that we would be highly skeptical of a claim that evidence was unintentionally destroyed pursuant to a routine policy after a request that the evidence be preserved. We will not second guess the district court's skepticism in those very circumstances.

*Id.* at 1313 (internal citations and quotations omitted). The court further faulted Skanska—a "sophisticated," "multinational company" for failing to take "the most fundamental of precautions" by backing up the cellphones and failing to actually implement a litigation hold. *Id.* at 1314. It also rejected Skanska's argument that a finding of bad faith required the spoliating party to have acted affirmatively. *Id.* Because Rule 37 allows sanctions where a party "failed to take reasonable steps to preserve" ESI, "[f]ailure to act can thus—by definition—be a violation of Rule 37." *Id.* "Skanska's passivity does not change the basic fact that the evidence was destroyed. Given that other circumstances pointed to a reasonable inference of bad faith by Skanska, it is irrelevant whether an act or a failure to act directly caused the spoliation." *Id.*

**A. Anticipation of Litigation and Reasonable Steps**

The Williamsons argue the defendants' emails indicate it anticipated legal action following the July 28, 2023 meeting. Heritage counters it was under no duty to preserve the video footage because it "had no reason to anticipate this § 1981 race-based, [sic] litigation as of August 11, 2023," the last day it could have preserved some of the video evidence. (Doc. 60 at 5). Additionally, because the July 2023 meeting focused only on J.W.'s behavior and autism diagnosis and the Williamsons never sent a preservation letter, settlement demand, or other communication to Heritage until they filed their complaint, (1) it could only have anticipated litigation

related to J.W.'s disability, not his race, and (2) the video footage was not relevant to disability-related litigation, its only value being whether it showed Heritage treated J.W. differently than his peers. As Heritage would have it, because it could not reasonably anticipate the specific nature of this discrimination suit, it had no duty to preserve the video and cannot be found liable for spoliation.

Heritage's argument is disingenuous at best. The video footage depicted J.W.'s behavior and the events giving rise to Harmon's disciplinary reports. That plainly relates to Heritage's stated reason for expelling J.W. Further, recognizing its communications clearly show it anticipated litigation, Heritage focuses on whether it should have anticipated a specific cause of action under § 1981. But, as the Williamsons assert, Heritage cites no authority requiring a party to anticipate the precise legal theory it is facing to trigger its duty to preserve evidence. Here, there can be no doubt that Heritage, which characterized the plaintiffs' comments during their last meeting as a "threat of legal action" and immediately contacted its own lawyers, anticipated the Williamsons would pursue legal action. (Doc. 57-34 at 2).[3] After all, "seeking legal counsel is indicative of anticipating litigation." *Compass Chem. Int'l, LLC v. True N. Prods., LLC*, No. 1:09-cv-3491, 2011 WL 13213914, at

[3] Heritage's motion for summary judgment adopts this rationale, stating it was motivated to expel J.W. due to the threat of litigation. (Doc. 48-1 at 8).

*23 (N.D. Ga. Feb. 15, 2011), *report and recommendation adopted* 2011 WL 13213870 (N.D. Ga. Mar. 21, 2011).

Heritage contends it expelled J.W. due to his classroom behavior; therefore, the video footage capturing his behavior—and on which administrators relied to support his expulsion—was clearly relevant. Heritage acknowledges it could have downloaded the video before it was overwritten and that it regularly did so when footage captured injuries "or other extraordinary events." Yet even after the Williamsons requested to watch the video to see if their son's behavior warranted discipline, Heritage offers no explanation why behavior it deemed worthy of expulsion did not qualify as an "extraordinary event" to justify preservation. This is especially troubling given the Williamsons threatened legal action and Heritage immediately involved its lawyer. Connecting these dots is straightforward: (1) Heritage should have anticipated and did, in fact, anticipate litigation; (2) therefore, it was obligated to take reasonable steps to preserve the relevant video evidence; and (3) downloading video footage showing J.W.'s conduct during his last two weeks of enrollment would have been reasonable.

**B. Replacement Evidence**

The Williamsons contend the video footage cannot be restored or replaced through additional discovery: "Testimony, which is prone to memory lapses and bias, is no match for video surveillance, which is 'unbiased, direct evidence about

what occurred.'" (Doc. 57 at 11, citing *U.S. E.E.O.C. v. Suntrust Bank*, No. 8:12-cv-1325-T-33MAP, 2014 WL 1364982, at *7 (M.D. Fla. Apr. 7, 2014)). "The spoliated video footage was an objective recording of what happened in the classroom; witnesses' testimony provides only their version of events." (*Id.*). Heritage concedes that other evidence "is not an absolute one to one replacement of the video"; it argues, however, that contemporaneous incident reports are a sufficient substitute because they were made by several different individuals who knew they were being recorded and did not anticipate litigation. Further, the Williamsons have deposed many Heritage witnesses who discussed their memories of the contents of the video footage they reviewed. The Williamsons reply that the authors of the reports were implicitly biased and the reports do not focus on the behavior of other students compared to J.W.

The court agrees with the Williamsons—video footage cannot be adequately replaced through reports or memory. In *Skanska*, the Eleventh Circuit affirmed spoliation sanctions even though some of the text messages at issue were available through other custodians and the custodians of the missing messages were deposed. 75 F.4th at 1312. Here, there is no way to know what the video footage depicted that the reports failed to capture or the witnesses failed to recollect. The video footage would have been direct, unbiased evidence of what occurred in Harmon's classroom, and the incident reports and witnesses' testimony are not an adequate substitute.

**C. Prejudice**

The Williamsons contend Heritage's destruction of the evidence is prejudicial because the video would have provided objective evidence of J.W.'s behavior relative to his classmates. Further, while Heritage relies on its employees' review of the video as justification for J.W.'s expulsion, the Williamsons cannot use the footage to challenge the witnesses' accounts, highlight any inconsistencies, or underscore errors or potential biases. In turn, Heritage largely rests on its position that the incident reports and witness testimony are an acceptable substitute for video footage. Having already rejected those arguments, the court will not address them again here.

Heritage also claims that because the footage supported its position, Heritage is the party who has been "punished . . . by not being able to play the video" and the Williamsons "should gain no advantage by failing to send a preservation [sic] or failing to make mention of rase-based [sic] for more than six (6) months following the disenrollment."[4] (Doc. 60 at 9). However, they cite no case law imposing a duty on the Williamsons to send a preservation letter, and the court has already concluded Heritage actually anticipated litigation and knew of the Williamsons' desire to review the footage. While a preservation letter is obviously a best practice, there is

[4] This argument conveniently overlooks the testimony of Harmon, J.W.'s teacher who wrote his discipline reports yet also testified his conduct did not warrant expulsion. (Doc. 57-17 at 46).

no evidence before the court regarding the time frame in which the Williamsons—private individuals whose prior request to review the footage was refused—hired counsel, nor is the court aware of any case holding that a failure to send a preservation letter weighs against a finding of prejudice. By contrast, Heritage was represented by counsel, who was aware of the Williamsons' interest in pursuing legal action. If, as Heritage contends, the video supported its version of events, Heritage's unexplained failure to preserve that evidence is its own fault, not the Williamsons'.

Finally, Heritage argues the court, in order to find prejudice, must find the video evidence was "crucial" to the Williamsons' ability to prove their prima facie case. (Doc. 60 at 10). Citing two cases from the Southern District of Florida, Heritage also claims the video footage would be duplicative of other evidence and self-servingly posits it would be "devastating to the Plaintiffs' case."[5] (*Id.* at 11). However, the court has no way of knowing whose version of events the video would support. Further, the two district court cases Heritage cites predate both the December 2015 amendment to Rule 37 and *Skanska*, and neither analyzes the requirements of Rule 37(e). Rule 37 requires only a finding that the Williamsons are prejudiced or that Heritage acted in bad faith.

[5] Again, this claim appears to be directly controverted by Harmon. (Doc. 57 at 46).

The court concludes (1) the Williamsons are prejudiced by the loss of objective video footage depicting J.W.'s classroom behavior and (2) the footage is critical to their case because Heritage relies on this very evidence to support its defense.

**D. Bad Faith**

The Williamsons assert Heritage acted in bad faith by failing to preserve the video footage because (1) it knew the evidence was critical to the threatened legal action, (2) the Williamsons had previously requested the footage, and (3) Heritage "had contacted its attorney—who surely would have advised Heritage to preserve evidence—about the matter." (Doc. 57 at 14). Heritage again points to the absence of a preservation or presuit demand letter and complains that the Williamsons waited six months to file suit. (Doc. 60 at 12). In their reply, the Williamsons urge the court to consider Heritage's other conduct, such as its immediate disenrollment of J.W. because they mentioned litigation and its refusal to allow them to review video of their son on the basis that it was not permitted even though no such policy existed. (Doc. 62 at 10). They believe these factors show an animus the court should interpret as Heritage's intent to deprive them of access to the video footage.

On these facts, it is a very close call whether Heritage acted with an intent to prevent the Williamsons from using the video evidence in support of their claims. However, with no direct evidence of bad faith, the court is reluctant to infer the worst

and finds Heritage's actions were grossly negligent. Therefore, it will not impose the harsher sanctions of a presumption of unfavorability, a jury instruction, or default judgment but will impose sanctions no greater than necessary to cure the prejudice. *See* Fed. R. Civ. P. 37(e).

**E. Measures Necessary to Cure the Prejudice**

Pursuant to Rule 37(e)(1), the Williamsons ask the court to (1) allow them to present spoliation evidence to the jury, (2) prohibit Heritage from relying on or presenting evidence about a witness's memory of the video in support of a summary judgment motion or at trial, and (3) award attorney's fees and costs for prosecuting its spoliation motion. (Doc. 57 at 13). The court finds these measures appropriate and narrowly targeted to cure the prejudice to the Williamsons caused by Heritage's spoliation.

Heritage's use of a video surveillance system, the Williamsons' request to review footage documenting J.W.'s behavior, and Hansen's reliance on her review of the video footage are facts integral to understanding the events in this action. Absent evidence concerning these events, a jury will not truly understand the substance of this case. Accordingly, while the Williamsons may introduce evidence about Heritage's video surveillance system policies and their denied request to review video evidence of J.W.'s conduct, Heritage's witnesses may not testify about the contents of the video footage beyond the fact that Hansen reviewed the video

footage in deciding to expel J.W. The court finds this limitation necessary to prevent the harm to the Williamsons that would necessarily follow if it permitted Heritage to substitute inherently unreliable and biased recollection testimony for objective video evidence. *See, e.g., AXIS Ins. Co. v. Terry*, No. 2:16-CV-01021-JHE, 2018 WL 9943825, at *9 (N.D. Ala. Apr. 23, 2018). Finally, an award of costs "serve[s] the purposes of deterrence and fairness" and compensates the Williamsons for the time spent prosecuting this motion. *See Jarvis v. TaylorChandler, LLC*, 480 F. Supp. 3d 1339, 1359 (M.D. Ala. 2020); *see also* Fed. R. Civ. P. 37 (generally allowing an award of fees to a party who successfully brings a discovery motion).

## III. Conclusion

For the foregoing reasons, the Williamsons' motion for spoliation sanctions is **GRANTED IN PART**. (Doc. 57). At trial, the Williamsons **MAY** introduce evidence about Heritage's video surveillance system, Heritage's policies relating to the use and preservation of video footage, their request to view video depicting the conduct underlying J.W.'s incident reports, and Heritage's denial of that request. However, Heritage **MAY NOT** introduce evidence or otherwise argue its version of events was corroborated by any video recording that was destroyed, nor may it introduce evidence that its administrators corroborated J.W.'s discipline reports by viewing video footage, except Hansen may testify that she based her expulsion decision on her review of the video footage.

Heritage **SHALL** pay the Williamsons their reasonable costs and expenses incurred in prosecuting their motion. Heritage is **ORDERED** to meet and confer with the Williamsons within **14 days** regarding the amount of the fees and costs they incurred in bringing their motion. If the parties cannot agree on the amount to be awarded, the Williamsons **SHALL** file their request for fees and costs and supporting documentation no later than **October 15, 2026**. Any objection to the Williamsons' request **SHALL** be filed within **7 days** thereafter.

**DONE** this 22nd day of September, 2026.

Staci G. Cornelius

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE